65 So.2d 203

**WEST v. STATE.**

**6 Div. 285.**

Court of Appeals of Alabama.

March 10, 1953.

Rehearing Denied March 31, 1953.

Ray & Giles, Birmingham, for appellant.

Si Garrett, Atty. Gen., and Thos. F. Parker, Asst. Atty. Gen., for the State.

PRICE, Judge.

The indictment charged murder in the first degree. Defendant was convicted of murder in the second degree. His punishment was fixed at ten years imprisonment in the penitentiary.

Deceased, Roland Lee Bradburn, was shot and killed at Bill's Place, a beer tavern operated by Bill Pearson, on Highway 78 in Jefferson County.

Bradburn, his brother-in-law, William O. Coley, and his nephew, James Coley, had been at Bill's Place on Thanksgiving night of 1950, from 8:30 until about 1:30 when the killing occurred.

The State contends soon after deceased and his party arrived appellant sat down in the booth with them and remarked to William O. Coley: "You look about the toughest one in here." Some time later West made a Thanksgiving speech on a

loud speaker. During the course of the evening defendant confided to a customer, Curtis Isbell, that he was a special agent for the F. B. I. and showed Isbell a pistol which he was carrying in his inside coat pocket.

There was evidence that a disagreement arose between deceased and Bill Pearson concerning a bill for seventy-five cents. During the argument Pearson implied that West was a collector or an officer and if the bill was not paid West would take deceased to jail. The State's witnesses did not remember any particular words spoken by West but stated that he was sitting there agreeing to it, and Pearson gave West a ticket with the debt on it. Every one had left except defendant, Pearson, and deceased's group. After the dispute was apparently peaceably settled, deceased and the Coleys walked outside. Bill Pearson was standing in the doorway and defendant was standing on the ground close to the door. After the Coleys had walked 15 or 20 steps they heard four or five shots from about the doorway, turned and saw deceased falling to the ground. A voice, which they testified was West's, told them to "get on down the road and don't come back up here."

Several officers testified that on the morning following the difficulty defendant said he didn't know who shot deceased. On Monday he told officer Boggan he wanted to tell the truth about the killing, that he shot deceased. He wanted to make a statement to that effect and wanted his lawyer present. He was taken to the finger print room and his attorney was called. Before the attorney arrived he stated in the presence of five officers and a stenographer that they could turn Pearson loose; "I shot him myself." Proper predicate was laid for the admission of each of said confessions.

The coroner testified as to the entrances and exits of the bullet wounds in deceased's body. One bullet entered the right chest and came out in the center of the back. One entered the left arm between the elbow and shoulder and came out on the right side of the abdomen. Another entered the left arm just above the wrist and went through the arm.

Pearson testified as the Coleys left deceased stepped over to the Rockola. Pearson asked him to leave, as it was closing time. Deceased acquiesced and as he was leaving defendant kicked him. Pearson claimed he smoothed over this difficulty and deceased left the building. Pearson went to the center of the room and turned off the front lights and turned to see West standing inside the front door. West said, "I have got your pistol" and began firing out the door. Pearson cried "Mr. West, Mr. West." Defendant turned, dropped the pistol and hollored: "Get on down the road and don't you come back in here."

Pearson claimed he did not know any one had been hurt. He picked up the pistol, closed up and went home, leaving by a side door.

Pearson was arrested and while in jail had this conversation with West:

"A. When I went in and spoke to him he asked me how I was getting along; I told him all right. He says, 'How are you?' and I says, 'This is hell.' I says, 'Mr. West, I thought me and you had always been good friends.' He says, 'Bill, I think you are one of the best friends I have got,' and I says, 'Why don't you tell these people something up here then so they will let me alone?' and he says, 'I have done told them, Bill, to turn you loose and told them I killed him,' and he says, 'I am afraid to talk any more, I am afraid I will get the hot seat.'"

Defendant introduced evidence by Dr. MacGruder that in January, 1948, he had a cerebral hemorrhage while on duty as a guard, which caused him to be paralyzed on the left side. He was treated at a hospital for 8 days and confined to the house for two weeks before going back to work.

Mrs. Ike Johnson testified she went to Bill's Place after the shooting. It was dark and there was no one there but defendant and the dead man. William Coley came up with Mr. Crane, the constable, and while

the officer was talking to defendant she asked Coley how it happened. Coley said "Bill Pearson shot him and run home."

Ike Johnson testified he drove Crane, Coley and defendant to the sheriff's office. On the way to town Coley said Mr. Pearson did the shooting from the top steps, and Mr. West was out there by the car telling them: "Get out of the way, boys, there is trouble here. Go on and get down the road."

Testifying in his own behalf, defendant stated he was 59 years old. He left home around 5 o'clock Thanksgiving afternoon. He visited with a relative at Irondale until 10 o'clock and picked up a stranger on the road and took him to Bill's Place. At some time during the evening he made a Thanksgiving speech. He drove the stranger up the road and showed him how to get to Leeds and returned to Bill's for another beer before going home. When he reentered the place Pearson was behind the counter talking to deceased and the Coleys about the seventy-five cent debt. Mr. Pearson addressed defendant as an officer or collector and winked at him and said something about West collecting the debt. One of the men asked why he didn't collect it if he was a collector and defendant replied that would not be necessary, the man had said he would pay it.

He testified he had no ill will against anyone present; he had no gun with him; he did not get hold of a gun; and did not shoot anybody; he did not see any one go down the front steps and didn't know who went out first. Defendant's recollection is that he went out the side door. His hearing is not good but it seems that when he came out the door and turned he heard the backfire of a car. He saw deceased lying in front of his car. Defendant was very nervous and was going to leave but his keys were on the counter and the store was locked. Cars were passing and it looked like they were going to hit deceased. He pulled the body off the highway and waited for some one to come.

Defendant admitted he stated to Pearson in jail that he was either drunk or crazy and didn't remember anything about the killing and asked Pearson if he knew anything about it. Pearson said he knew all about it; that defendant had had only a few beers and the first thing he knew defendant had come from the counter with Pearson's gun in his pocket and kicked one of the fellows on the foot and went on out in the yard and did the shooting and threw the gun back in the house.

Defendant introduced evidence by several witnesses as to his good reputation for peace and quiet and that Bill Pearson's reputation was bad for peace and quiet and for truth and veracity.

In addition to his plea of not guilty defendant interposed a special plea of not guilty by reason of insanity and evidence was offered in support of said plea. At the conclusion of the testimony the insanity plea was withdrawn.

The theory of the defense is that Pearson did the shooting and insists this theory is further borne out by the admissions of Bill Pearson on cross examination that after the shooting he went home, emptied the pistol and threw the blanks away, put the pistol in a chest of drawers under some clothing and went to bed. When the officers asked about the gun he told them he hadn't seen it since last fall. And by the cross examination of Charlie Ford, who had testified to Pearson's bad character, that on one occasion Pearson "taken a can of beer and threw it against the side of the building and pulled out a pistol and told me to get on down the road; and after I started down the road, he shot at me two or three times." and the testimony of Frank McCombs who stated he had see Pearson shoot at Ford and several of the colored men.

■ The conflict in the evidence presented a jury question, and after a careful consideration of all the evidence adduced on the trial it is our opinion it was sufficient, if believed by the jury beyond a reasonable doubt, to support the verdict of the jury and to sustain the judgment of the court. There was no error in the court's action in refusing the affirmative charge and in overruling the motion for a new trial.

Appellant insists the court erred in admitting in evidence three bullets picked up by the officer at the scene of the homicide.

"As a general rule, articles, including those found at the scene of the crime, which are properly identified and which tend to show the commission of the crime or the manner in which it was committed, or to elucidate some matter in issue, are admissible * * * for inspection and observation". 22 C.J.S. Criminal Law, Sec. 709. See also Frost v. State, 225 Ala. 232, 142 So. 427; Boyette v. State, 215 Ala. 472, 110 So. 812.

The bullets were not identified as the ones which killed deceased. Nor was there evidence tending to show the bullets were of the caliber of the gun used in the killing. They were not shown to be connected in any manner with the crime or with the accused, and shed no light on any material inquiry in the case. If their admission was error, which we do not decide, from a careful examination of the entire cause, we are unable to say that appellant's substantial rights were probably injuriously affected thereby. Supreme Court Rule 45, Code 1940, Title 7.

Defendant's witness, Charlie Ford, testified to the general bad reputation and to the bad reputation for peace and quiet of the State's witness, Bill Pearson. On cross examination he was asked, without objection, if Pearson, who was Superintendent for Stephenson Brick Company, had fired witness for being drunk and failing to report for work. The witness answered in the affirmative. This question was then propounded by the Solicitor: "Q. I will ask you if, after that, if you didn't go to the Grievance Committee, and the Grievance Committee sustained Mr. Pearson, didn't they?" Defendant objected to this question and the Solicitor stated: "I want to show this man's interest, your Honor, proving the character of the man." The court overruled the objection and defendant duly excepted. The witness answered: "Yes, sir."

The case of Louisville & N. R. Co. v. Martin, 240 Ala. 124, 198 So. 141, contains a comprehensive discussion by Chief Justice Gardner as to the right of cross examination to elicit circumstances showing bias, prejudice or hostility on the part of a witness.

The rule as to the extent of such examination is stated in 58 Am.Jur., Witnesses, Sec. 715, as follows:

"While it has been observed that the law grants the trial court broad discretion on cross examination affecting motive, interest or animus of the witness, the proper scope for the exercise of the court's discretion is in limiting the cross examination to a disclosure of such facts only as may show the existence of hostility, and rejecting any matters which might be pertinent only to a justification of hostility on the part of witness, for it is the existence of the feeling which is material, and not the right or wrong in the transaction which occasions it." See also Bailey v. State, 168 Ala. 4, 53 So. 296, 390.

That Pearson's action in discharging witness was justified by the Grievance Committee was not material to the inquiry and defendant's objection should have been sustained.

The question propounded to defense witness Parsons "I will ask you, is he (Pearson) Superintendent now" called for irrelevant testimony, and the State's objection was properly sustained.

The error, if any, in allowing the Solicitor to ask defendant's wife if she didn't know defendant was arrested and brought to the sheriff's office charged with public drunkenness, in February of 1948, was rendered harmless by witness' answer, "I don't recall."

Refused charge 24, if not otherwise faulty, is argumentative. Furthermore, it asserts if the confession proceeded from "other reason than an actual consciousness

of guilt," without specifying to what "other reason" it refers.

For the error set out above the judgment of the trial court is reversed and the cause remanded.

Reversed and remanded.